**VAS–CATH INCORPORATED and Gambro, Inc., Plaintiffs–Appellees,**

v.

**Sakharam D. MAHURKAR, and Quinton Instruments Company, Defendants–Appellants.**

**Nos. 90–1528, 91–1032.**

United States Court of Appeals, Federal Circuit.

June 7, 1991.

Rehearing Denied July 8, 1991.

Suggestion for Rehearing In Banc Declined July 29, 1991.

William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield,

N.J., argued, for plaintiffs-appellees. With him on the brief, were Roy H. Wepner, John R. Nelson and Joseph S. Littenberg.

Raymond P. Niro, Niro, Scavone, Haller & Niro, Chicago, Ill., argued, for defendants-appellants. With him on the brief, were Joseph N. Hosteny and John C. Janka. Of Counsel was Michael P. Mazza.

Michael J. Sweedler, Darby & Darby, New York City, represented defendants-appellants, Quinton Instruments Co.

Before RICH, MICHEL and PLAGER, Circuit Judges.

RICH, Circuit Judge.

Sakharam D. Mahurkar and Quinton Instruments Company (collectively Mahurkar) appeal from the September 12, 1990 partial final judgment[1] of the United States District Court for the Northern District of Illinois, Easterbrook, J., sitting by designation, in Case No. 88 C 4997. Granting partial summary judgment to Vas–Cath Incorporated and its licensee Gambro, Inc. (collectively Vas–Cath), the district court declared Mahurkar's two United States utility patents Nos. 4,568,329 ('329 patent)

and 4,692,141 ('141 patent), titled "Double Lumen Catheter," invalid as anticipated under 35 U.S.C. § 102(b). In reaching its decision, reported at 745 F.Supp. 517, 17 USPQ2d 1353, the district court concluded that none of the twenty-one claims of the two utility patents was entitled, under 35 U.S.C. § 120, to the benefit of the filing date of Mahurkar's earlier-filed United States design patent application Serial No. 356,081 ('081 design application), which comprised the same drawings as the utility patents, because the design application did not provide a "written description of the invention" as required by 35 U.S.C. § 112, first paragraph. We *reverse* the grant of summary judgment with respect to all claims.

## BACKGROUND

Sakharam Mahurkar filed the '081 design application, also titled "Double Lumen Catheter," on March 8, 1982. The application was abandoned on November 30, 1984. Figures 1–6 of the '081 design application are reproduced below.

---

1. The district court directed entry of final judgment as to the issue of patent invalidity pursu-

ant to Fed.R.Civ.P. 54(b).

FIG.1 FIG.2 FIG.3 FIG.4 FIG.5 FIG.6

As shown, Mahurkar's catheter comprises a pair of tubes (lumens) designed to allow blood to be removed from an artery, processed in an apparatus that removes impurities, and returned close to the place of removal. Prior art catheters utilized concentric circular lumens, while Mahurkar's employs joined semi-circular tubes that come to a single tapered tip. Advantageously, the puncture area of Mahurkar's semicircular catheter is 42% less than that of a coaxial catheter carrying the same quantity of blood, and its conical tip yields low rates of injury to the blood. The prior art coaxial catheters are now obsolete; Mahurkar's catheters appear to represent more than half of the world's sales. 745 F.Supp. at 520, 17 USPQ2d at 1353–54.

After filing the '081 design application, Mahurkar also filed a Canadian Industrial Design application comprising the same drawings plus additional textual description. On August 9, 1982, Canadian Industrial Design 50,089 (Canadian '089) issued on that application.

More than one year later, on October 1, 1984, Mahurkar filed the first of two utility patent applications that would give rise to the patents now on appeal. Notably, both utility applications included the same drawings as the '081 design application.[2] Serial No. 656,601 ('601 utility application)

2. The utility patent drawings contain additional but minor shading and lead lines and reference numerals not present in the design application drawings.

claimed the benefit of the filing date of the '081 design application, having been denominated a "continuation" thereof. In an Office Action mailed June 6, 1985, the Patent and Trademark Office (PTO) examiner noted that "the prior application is a design application," but did not dispute that the '601 application was entitled to its filing date. On January 29, 1986, Mahurkar filed Serial No. 823,592 ('592 utility application), again claiming the benefit of the filing date of the '081 design application (the '592 utility application was denominated a continuation of the '601 utility application). In an office action mailed April 1, 1987, the examiner stated that the '592 utility application was "considered to be fully supported by applicant's parent application SN 356,081 filed March 8, 1982 [the '081 design application]." The '601 and '592 utility applications issued in 1986 and 1987, respectively, as the '329 and '141 patents, the subjects of this appeal. The independent claims of both patents are set forth in the Appendix hereto.

Vas–Cath sued Mahurkar in June 1988, seeking a declaratory judgment that the catheters it manufactured did not infringe Mahurkar's '329 and '141 utility patents.[3] Vas–Cath's complaint alleged, inter alia, that the '329 and '141 patents were both invalid as anticipated under 35 U.S.C. § 102(b) by Canadian '089. Vas–Cath's anticipation theory was premised on the argument that the '329 and '141 patents were not entitled under 35 U.S.C. § 120[4] to the filing date of the '081 design application because its drawings did not provide an adequate "written description" of the claimed invention as required by 35 U.S.C. § 112, first paragraph.

Mahurkar counterclaimed, alleging infringement. Both parties moved for summary judgment on certain issues, including validity. For purposes of the summary judgment motion, Mahurkar conceded that, if he could not antedate it, Canadian '089 would represent an enabling and thus anticipating § 102(b) reference against the claims of his '329 and '141 utility patents. 745 F.Supp. at 521, 17 USPQ2d at 1355. Vas–Cath conceded that the '081 design drawings *enabled* one skilled in the art to practice the claimed invention within the meaning of 35 U.S.C. § 112, first paragraph. *Id.* Thus, the question before the district court was whether the disclosure of the '081 design application, namely, the drawings without more, adequately meets the "written description" requirement also contained in § 112, first paragraph, so as to entitle Mahurkar to the benefit of the 1982 filing date of the '081 design application for his two utility patents and thereby antedates Canadian '089.

Concluding that the drawings do not do so, and that therefore the utility patents are anticipated by Canadian '089, the district court held the '329 and '141 patents wholly invalid under 35 U.S.C. § 102(b), *id.* at 524, 17 USPQ2d at 1358, and subsequently granted Mahurkar's motion for entry of a partial final judgment under Fed. R.Civ.P. 54(b) on the validity issue. This appeal followed.

## DISCUSSION

The issue before us is whether the district court erred in concluding, on summary judgment, that the disclosure of the '081 design application does not provide a § 112, first paragraph "written description" adequate to support each of the claims of

---

3. Vas–Cath's apprehension of suit apparently arose from a 1988 Canadian action instituted by Mahurkar for infringement of Canadian '089.

4. Section 120, titled "Benefit of Earlier Filing Date in the United States," provides (emphasis ours):

An application for patent for an invention *disclosed in the manner provided by the first paragraph of section 112 of this title* in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

the '329 and '141 patents. If the court so erred as to any of the 21 claims at issue, the admittedly anticipatory disclosure of Canadian '089 will have been antedated (and the basis for the court's grant of summary judgment nullified) as to those claims.

■ In reviewing the district court's grant of summary judgment, we are not bound by its holding that no material facts are in dispute, and must make an independent determination as to whether the standards for summary judgment have been met. *C.R. Bard, Inc. v. Advanced Cardiovascular Systems*, 911 F.2d 670, 673, 15 USPQ2d 1540, 1542–43 (Fed.Cir.1990). Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*The "Written Description" Requirement of § 112*

The first paragraph of 35 U.S.C. § 112 requires that

> [t]he specification shall contain *a written description of the invention*, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

(Emphasis added). Application of the "written description" requirement, derived from the portion of § 112 emphasized above, is central to resolution of this appeal. The district court, having reviewed this court's decisions on the subject, remarked that "[u]nfortunately, it is not so easy to tell what the law of the Federal Circuit is." 745 F.Supp. at 522, 17 USPQ2d at 1356. Perhaps that is so, and, therefore,

before proceeding to the merits, we review the case law development of the "written description" requirement with a view to improving the situation.[5]

The cases indicate that the "written description" requirement most often comes into play where claims not presented in the application when filed are presented thereafter. Alternatively, patent applicants often seek the benefit of the filing date of an earlier-filed foreign or United States application under 35 U.S.C. § 119 or 35 U.S.C. § 120, respectively, for claims of a later-filed application. The question raised by these situations is most often phrased as whether the application provides "adequate support" for the claim(s) at issue; it has also been analyzed in terms of "new matter" under 35 U.S.C. § 132. The "written description" question similarly arises in the interference context, where the issue is whether the specification of one party to the interference can support the claim(s) corresponding to the count(s) at issue, i.e., whether that party "can make the claim" corresponding to the interference count.

To the uninitiated, it may seem anomalous that the first paragraph of 35 U.S.C. § 112 has been interpreted as requiring a separate "description of the invention," when the invention is, necessarily, the subject matter defined in the *claims* under consideration. *See In re Wright*, 866 F.2d 422, 424, 9 USPQ2d 1649, ·1651 (Fed.Cir. 1989). One may wonder what purpose a separate "written description" requirement serves, when the second paragraph of § 112 expressly requires that the applicant conclude his specification "with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

One explanation is historical: the "written description" requirement was a part of the patent statutes at a time *before* claims were required. A case in point is *Evans v. Eaton*, 20 U.S. (7 Wheat.) 356, 5 L.Ed. 472 (1822), in which the Supreme Court affirmed the circuit court's decision that the

---

5. For additional background, *see* Rollins, "35 USC 120—The Description Requirement," 64 *J.Pat.Off.Soc'y* 656 (1982); Walterscheid, "Insuf-ficient Disclosure Rejections (Part III)," 62 *J.Pat. Off.Soc'y* 261 (1980).

plaintiff's patent was "deficient," and that the plaintiff could not recover for infringement thereunder. The patent laws then in effect, namely the Patent Act of 1793, did not require claims, but did require, in its 3d section, that the patent applicant "deliver a written description of his invention, and of the manner of using, or process of compounding, the same, in such full, clear and exact terms, as to distinguish the same from all things before known, and to enable any person skilled in the art or science of which it is a branch, or with which it is most nearly connected, to make, compound and use the same...." *Id.* at 430. In view of this language, the Court concluded that the specification of a patent had two objects, the first of which was "to enable artizans to make and use [the invention]...." *Id.* at 433. The second object of the specification was

> to put the public in possession of what the party claims as his own invention, so as to ascertain if he claims anything that is in common use, or is already known, and to guard against prejudice or injury from the use of an invention which the party may otherwise innocently suppose not to be patented. It is, therefore, for the purpose of warning an innocent purchaser, or other person using a machine, of his infringement of the patent; and at the same time, of taking from the inventor the means of practising upon the credulity or the fears of other persons, by pretending that his invention is more than what it really is, or different from its ostensible objects, that the patentee is required to distinguish his invention in his specification.

*Id.* at 434.

A second, policy-based rationale for the inclusion in § 112 of both the first paragraph "written description" and the second paragraph "definiteness" requirements was set forth in *Rengo Co. v. Molins Mach. Co.,* 657 F.2d 535, 551, 211 USPQ 303, 321 (3d Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 591 (1981):

> [T]here is a subtle relationship between the policies underlying the description and definiteness requirements, as the two standards, while complementary, approach a similar problem from different directions. Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation. The definiteness requirement shapes the future conduct of persons other than the inventor, by insisting that they receive notice of the scope of the patented device.

With respect to the first paragraph of § 112 the severability of its "written description" provision from its enablement ("make and use") provision was recognized by this court's predecessor, the Court of Customs and Patent Appeals, as early as *In re Ruschig,* 379 F.2d 990, 154 USPQ 118 (CCPA 1967). Although the appellants in that case had presumed that the rejection appealed from was based on the enablement requirement of § 112, *id.* at 995, 154 USPQ at 123, the court disagreed:

> [T]he question is not whether [one skilled in the art] would be so enabled but whether the specification discloses the compound to him, specifically, *as something appellants actually invented....* If [the rejection is] based on section 112, it is on the requirement thereof that "The specification shall contain a written description *of the invention * * *.*" (Emphasis ours.)

*Id.* at 995–96, 154 USPQ at 123 (first emphasis added). The issue, as the court saw it, was one of fact: "Does the specification convey clearly to those skilled in the art, to whom it is addressed, in any way, the information that appellants invented that specific compound [claimed]?" *Id.* at 996, 154 USPQ at 123.

In a 1971 case again involving chemical subject matter, the court expressly stated that "it is possible for a specification to *enable* the practice of an invention as broadly as it is claimed, and still not *describe* that invention." *In re DiLeone,* 436 F.2d 1404, 1405, 168 USPQ 592, 593 (CCPA 1971) (emphasis added). As an example, the court posited the situation "where the specification discusses *only* compound A

and contains *no* broadening language of any kind. This might very well enable one skilled in the art to make and use compounds B and C; yet the class consisting of A, B and C has not been described." *Id.* at 1405 n. 1, 168 USPQ 593 n. 1 (emphases in original). *See also In re Ahlbrecht,* 435 F.2d 908, 911, 168 USPQ 293, 296 (CCPA 1971) (although disclosure of parent application may have *enabled* production of claimed esters having 2–12 methylene groups, it only *described* esters having 3–12 methylene groups).

The CCPA also recognized a subtle distinction between a written description adequate to *support* a claim under § 112 and a written description sufficient to *anticipate* its subject matter under § 102(b). The difference between "claim-supporting disclosures" and "claim-anticipating disclosures" was dispositive in *In re Lukach,* 442 F.2d 967, 169 USPQ 795 (CCPA 1971), where the court held that a U.S. "grandparent" application did not sufficiently describe the later-claimed invention, but that the appellant's intervening British application, a counterpart to the U.S. application, anticipated the claimed subject matter. As the court pointed out, "the description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes ..., whereas the same information in a specification might not alone be enough to provide a description of that invention for purposes of adequate disclosure...." *Id.* at 970, 169 USPQ at 797 (citations omitted).

The purpose and applicability of the "written description" requirement were addressed in *In re Smith and Hubin,* 481 F.2d 910, 178 USPQ 620 (CCPA 1973), where the court stated:

> Satisfaction of the description requirement insures that subject matter presented in the form of a claim subsequent to the filing date of the application was sufficiently disclosed at the time of filing so that the prima facie date of invention

can fairly be held to be the filing date of the application. This concept applies whether the case factually arises out of an assertion of entitlement to the filing date of a previously filed application under § 120 ... or arises in the interference context wherein the issue is support for a count in the specification of one or more of the parties ... or arises in an ex parte case involving a single application, but where the claim at issue was filed subsequent to the filing of the application....

*Id.* at 914, 178 USPQ at 623–24 (citations omitted).

The CCPA's "written description" cases often stressed the fact-specificity of the issue. *See, e.g., In re Wertheim,* 541 F.2d 257, 262, 191 USPQ 90, 96 (CCPA 1976) ("The primary consideration is *factual* and depends on the nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure") (emphasis in original); *In re Smith,* 458 F.2d 1389, 1395, 173 USPQ 679, 683 (CCPA 1972) ("Precisely how close the description must come to comply with § 112 must be left to case-by-case development"); *Di-Leone,* 436 F.2d at 1405, 168 USPQ at 593 ("What is needed to meet the description requirement will necessarily vary depending on the nature of the invention claimed"). The court even went so far as to state:

> [I]t should be readily apparent from recent decisions of this court involving the question of compliance with the description requirement of § 112 that each case must be decided on its own facts. Thus, the precedential value of cases in this area is extremely limited.

*In re Driscoll,* 562 F.2d 1245, 1250, 195 USPQ 434, 438 (CCPA 1977).

Since its inception, the Court of Appeals for the Federal Circuit has frequently addressed the "written description" requirement of § 112.[6] A fairly uniform standard

---

6. *See, Chester v. Miller,* 906 F.2d 1574, 15 USPQ2d 1333 (Fed.Cir.1990) (parent application's disclosure of chemical species constituted 102(b) prior art against continuation-in-part (c-i-p) application on appeal, but did not provide

sufficient written description to support c-i-p's claims to encompassing genus); *In re Gosteli,* 872 F.2d 1008, 10 USPQ2d 1614 (Fed.Cir.1989) (foreign priority application's disclosure of chemical subgenus was insufficient written de-

for determining compliance with the "written description" requirement has been maintained throughout: "Although [the applicant] does not have to describe exactly the subject matter claimed, ... the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed." *In re Gosteli*, 872 F.2d 1008, 1012, 10 USPQ2d 1614, 1618 (Fed.Cir.1989) (citations omitted). "[T]he test for sufficiency of support in a parent application is whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Ralston Purina Co. v. Far–Mar–Co, Inc.*, 772 F.2d 1570, 1575, 227 USPQ 177, 179 (Fed.Cir.1985) (quoting *In re Kaslow*, 707 F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed.Cir.1983)). Our cases also provide that compliance with the "written description" requirement of § 112 is a question of fact, to be reviewed under the clearly erroneous standard. *Gosteli*, 872 F.2d at 1012, 10 USPQ2d at 1618; *Utter v. Hiraga*, 845 F.2d 993, 998, 6 USPQ2d 1709, 1714 (Fed.Cir.1988).

There appears to be some confusion in our decisions concerning the extent to which the "written description" requirement is separate and distinct from the enablement requirement. For example, in *In re Wilder*, 736 F.2d 1516, 1520, 222 USPQ 369, 372 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985), we flatly stated: "The description

requirement is found in 35 U.S.C. § 112 and is separate from the enablement requirement of that provision." However, in a later case we said, "The purpose of the [written] description requirement [of section 112, first paragraph] is to state what is needed to fulfill the enablement criteria. These requirements may be viewed separately, but they are intertwined." *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1421, 5 USPQ2d 1194, 1197 (Fed.Cir. 1987), *cert. denied*, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 198 (1988). "The written description must communicate that which is needed to enable the skilled artisan to make and use the claimed invention." *Id.*

To the extent that *Kennecott* conflicts with *Wilder*, we note that decisions of a three-judge panel of this court cannot overturn prior precedential decisions. *See UMC Elec. Co. v. United States*, 816 F.2d 647, 652 n. 6, 2 USPQ2d 1465, 1468 n. 7 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). This court in *Wilder* (and the CCPA before it) clearly recognized, and we hereby reaffirm, that 35 U.S.C. § 112, first paragraph, requires a "written description of the invention" which is separate and distinct from the enablement requirement. The purpose of the "written description" requirement is broader than to merely explain how to "make and use"; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date

scription to support genus claims of corresponding U.S. application); *In re Wright*, 866 F.2d 422, 9 USPQ2d 1649 (Fed.Cir.1989) (application in "clear compliance" with § 112 "written description" requirement with respect to claim limitation that microcapsules were "not permanently fixed"); *Utter v. Hiraga*, 845 F.2d 993, 998, 6 USPQ2d 1709, 1714 (Fed.Cir.1988) (holding generic interference count to scroll compressor supported by written description of foreign priority application, the court stated, "A specification may, within the meaning of 35 U.S.C. § 112 ¶ 1, contain a written description of a broadly claimed invention without describing all species that claim encompasses"); *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 5 USPQ2d 1194 (Fed.Cir.1987) (parent application's lack of express disclosure of inherent "equiaxed microstructure" property did not deprive c-i-p's claims to a sintered ceramic body having said property of the benefit of parent's

filing date), *cert. denied*, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 198 (1988); *Ralston Purina Co. v. Far–Mar–Co, Inc.*, 772 F.2d 1570, 227 USPQ 177 (1985) (parent application's disclosure provided adequate written description support for certain claim limitations respecting protein content, temperature, and moisture content, but not others); *In re Wilder*, 736 F.2d 1516, 222 USPQ 369 (1984) (broadly worded title, general description of drawing, and objects of invention of parent patent application did not adequately support reissue application claims directed to genus of indicating mechanisms for dictating machines), *cert. denied*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985); *In re Kaslow*, 707 F.2d 1366, 217 USPQ 1089 (Fed.Cir. 1983) (claims to method of redeeming merchandise coupons, comprising step of providing an audit of coupon traffic, were not supported by specification of parent application).

sought, he or she was in possession *of the invention*. The invention is, for purposes of the "written description" inquiry, *whatever is now claimed.*

### The District Court's Analysis

■ We agree with the district court's conclusion that drawings alone *may* be sufficient to provide the "written description of the invention" required by § 112, first paragraph. Several earlier cases, though not specifically framing the issue in terms of compliance with the "written description" requirement, support this conclusion.

For example, we previously stated that "[t]here is no statutory prohibition against an applicant's reliance, in claiming priority under 35 U.S.C. § 120, on a disclosure in a design application if the statutory conditions are met." *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1574, 228 USPQ 32, 33 (Fed.Cir.1985). The question whether the applicant's claim to a pocket for athletic shoes was in fact entitled to the filing date of his earlier design application was not resolved in *KangaROOS*, however. Issues of intent to deceive the PTO were involved, as well as an error of law by the district court in construing the claims of the wrong application. *Id.* at 1574–75, 228 USPQ at 34–35. The district court's grant of partial summary judgment of inequitable conduct was vacated and the case remanded for trial.

*In re Berkman*, 642 F.2d 427, 209 USPQ 45 (CCPA 1981) involved a claim under 35 U.S.C. § 120 to the benefit of the filing date of two earlier design patent applications that included drawings of a carrying and storage case for tape cartridges and cassettes. The invention claimed in the later-filed utility application was an "insert" of "compartmented form," adapted for use in the interior of the storage case. *Id.* at 429, 209 USPQ at 47. The court characterized the dispositive issue as "whether the design applications sufficiently disclose the invention now claimed in the ... utility application at bar." *Id.* at 429, 209 USPQ at 46. While specifically recognizing that "drawings may be used to satisfy the disclosure requirement," *id.* at 429,

209 USPQ at 46–47, the court held that Berkman's design applications "fail[ed] to disclose the claimed invention sufficiently to comply with the requirements of § 112 first paragraph." As the court explained:

Nowhere in the design applications is the word "insert" used, nor is there any indication that the interiors of the cases are inserts. The drawings do not disclose how the insert can be used to accommodate either cassette or cartridge type tape enclosures. Berkman argues that one skilled in the art would readily recognize that the interiors of the cases illustrated in the design drawings are inserts. We do not agree. There is nothing shown in the drawings to lead one of ordinary skill to such a conclusion.

*Id.* at 430, 209 USPQ at 47.

The issue in *In re Wolfensperger*, 49 CCPA 1075, 302 F.2d 950, 133 USPQ 537 (1962) was whether the specification of the applicant's utility patent application disclosing a ball valve, and particularly the drawings thereof, supported a claim limitation that read: "having, in untensioned condition, a mean diameter corresponding approximately to the mean diameter of said chamber and a radial width smaller than the radial width of said chamber...." *Id.* at 1077, 302 F.2d at 952, 133 USPQ at 538. The court did not agree with the Board's conclusion that the "radial width" relationship was not supported by applicant's figure 5:

The board's statement that "drawings alone cannot form the basis of a valid claim" is too broad a generalization to be valid and is, furthermore, contrary to well-settled and long-established Patent Office practice.... Consider, for one thing, that the sole disclosure in a design patent application is by means of a drawing.... For another thing, consider that the only informative and significant disclosure in many electrical and chemical patents is by means of circuit diagrams or graphic formulae, constituting "drawings" in the case....

... The practical, legitimate enquiry in each case of this kind is what the drawing in fact discloses to one skilled in the art....

... The issue here is whether there is supporting "disclosure" and it does not seem, under established procedure of long standing, approved by this court, to be of any legal significance whether the disclosure is found in the specification or in the drawings so long as it is there. *Id.* at 1080–83, 302 F.2d at 955–56, 133 USPQ at 541–42.

Employing a "new matter" analysis, the court in *In re Heinle*, 342 F.2d 1001, 145 USPQ 131 (CCPA 1965) reversed a PTO rejection of the applicant's claims to a "toilet paper core" as "including subject matter having no clear basis in the application as filed." *Id.* at 1003, 145 USPQ at 133. The claim limitation said to be without support required that the width of the apertures in the core be "approximately one-fourth of the circumference of said core." *Id.* at 1007, 145 USPQ at 136. Having reviewed the application drawings relied upon for support, the court stated:

> it seems to us that [the drawings] conform to the one-fourth circumference limitation almost exactly. But the claim requires only an approximation. Since we believe an amendment to the specification to state that one-fourth of the circumference is the aperture width would not violate the rule against "new matter," we feel that supporting disclosure exists. The rejection is therefore in error.

*Id.*

These cases support our holding that, under proper circumstances, drawings alone may provide a "written description" of an invention as required by § 112. Whether the drawings are those of a design application or a utility application is not determinative, although in most cases the latter are much more detailed. In the instant case, however, the design drawings are substantially identical to the utility application drawings.

Although we join with the district court in concluding that drawings may suffice to satisfy the "written description" requirement of § 112, we can not agree with the legal standard that the court imposed for "written description" compliance, nor with the court's conclusion that no genuine issues of material fact were in dispute.

With respect to the former, the district court stated that although the '081 design drawings in question "allowed practice" [i.e., enabled], they did not necessarily

> show what the invention is, when "the invention" could be a subset or a superset of the features shown. Is the invention the semi-circular lumens? The conical tip? The ratio at which the tip tapers? The shape, size, and placement of the inlets and outlets? You can measure all of these things from the diagrams in serial '081 and so can practice the device, but you cannot tell, because serial '081 does not say, what combination of these things is "the invention", and what range of variation is allowed without exceeding the scope of the claims. To show one example of an invention, even a working model, is not to describe what is novel or important.

745 F.Supp. at 522, 17 USPQ2d at 1356.

We find the district court's concern with "what the invention is" misplaced, and its requirement that the '081 drawings "describe what is novel or important" legal error. There is "no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345, 81 S.Ct. 599, 604, 5 L.Ed.2d 592 (1961). "The invention" is defined by the claims on appeal. The instant claims do not recite *only* a pair of semi-circular lumens, or a conical tip, or a ratio at which the tip tapers, or the shape, size, and placement of the inlets and outlets; they claim *a double lumen catheter* having a *combination* of those features. That combination invention *is* what the '081 drawings show. As the district court itself recognized, "what Mahurkar eventually patented is exactly what the pictures in serial '081 show." 745 F.Supp. at 523, 17 USPQ2d at 1357.

We find the "range of variation" question, much emphasized by the parties, more troublesome. The district court stated that "although Mahurkar's patents use the same diagrams, [the claims] contain limita-

tions that did not follow ineluctably [i.e., inevitably] from the diagrams." *Id.* at 524, 17 USPQ2d at 1357. As an example, the court stated (presumably with respect to independent claims 1 and 7 of the '329 patent) that

> the utility patents claim a return lumen that is "substantially greater than one-half but substantially less than a full diameter" after it makes the transition from semi-circular to circular cross-section, and the drawings of serial '081 fall in this range. But until the utility application was filed, nothing established that they had to—for that matter that the utility patent would claim anything other than the *precise* ratio in the diagrams....

*Id.* at 523, 17 USPQ2d at 1357. Mahurkar argues that one of ordinary skill in this art, looking at the '081 drawings, would be able to derive the claimed range.

The declaration of Dr. Stephen Ash, submitted by Mahurkar, is directed to these concerns. Dr. Ash, a physician specializing in nephrology (the study of the kidney and its diseases) and chairman of a corporation that develops and manufactures biomedical devices including catheters, explains why one of skill in the art of catheter design and manufacture, studying the drawings of the '081 application in early 1982, would have understood from them that the return lumen must have a diameter within the range recited by independent claims 1 and 7 of the '329 patent. Dr. Ash explains in detail that a return (longer) lumen of diameter less than half that of the two lumens combined would produce too great a pressure increase, while a return lumen of diameter equal or larger than that of the two lumens combined would result in too great a pressure drop.[7] "Ordinary experience with the flow of blood in catheters would lead directly away from any such arrangement," Ash states.

Although the district court found this reasoning "logical," it noted that later patents issued to Mahurkar disclose diameter ratios closer to 1.0 (U.S.Patent No. 4,584,-968) and exactly 0.5 (U.S.Des.Patent No. 272,651). If these other ratios were desirable, the district court queried, "how does serial '081 necessarily exclude the[m]?" 745 F.Supp. at 523, 17 USPQ2d at 1357.

■ The district court erred in taking Mahurkar's other patents into account. Mahurkar's *later* patenting of inventions involving different range limitations is irrelevant to the issue at hand. Application sufficiency under § 112, first paragraph, must be judged as of the filing date. *United States Steel Corp. v. Phillips Petroleum Co.,* 865 F.2d 1247, 1251, 9 USPQ2d 1461, 1464 (Fed.Cir.1989).

■ The court further erred in applying a legal standard that essentially required the drawings of the '081 design application to *necessarily exclude* all diameters other than those within the claimed range. We question whether any drawing could ever do so. At least with respect to independent claims 1 and 7 of the '329 patent and claims depending therefrom, the proper test is whether the drawings conveyed with reasonable clarity to those of ordinary skill that Mahurkar had in fact invented the catheter recited in those claims, having (among several other limitations) a return lumen diameter substantially less than 1.0 but substantially greater than 0.5 times the diameter of the combined lumens. Consideration of what the drawings conveyed to persons of ordinary skill is essential. *See Ralston Purina,* 772 F.2d at 1575, 227 USPQ at 179 (ranges found in applicant's claims need not correspond *exactly* to those disclosed in parent application; issue is whether one skilled in the art could derive the claimed ranges from parent's disclosure).

---

7. Higher pressure drops are associated with smaller cross-sectional areas for fluid flow. Mahurkar's opening brief to this court states that by applying well-known principles of fluid mechanics (i.e., the work of Poiseuille and Hagen), it can be calculated that the diameter of

the circular (return) lumen would have to be in the range of 0.66 times the diameter of the two lumens combined in order to achieve proper blood flow at equal pressure drop. The 0.66 ratio falls within the noted claim limitation.

Mahurkar submitted the declaration of Dr. Ash on this point; Vas–Cath submitted no technical evidence to refute Ash's conclusions. Although the district court considered Dr. Ash's declaration, we believe its import was improperly disregarded when viewed through the court's erroneous interpretation of the law.[8] We hold that the Ash declaration and Vas–Cath's non-refutation thereof, without more, gave rise to a genuine issue of material fact inappropriate for summary disposition. *See Hesston Corp. v. Sloop*, 1988 U.S.Dist. LEXIS 1573, *13 (D.Kansas) (summary judgment on § 112 "written description" issue inappropriate where resolution of what parent disclosure conveyed to those skilled in the art may require examination of experts, demonstrations and exhibits).

Mahurkar urges that at least some of the remaining claims do not contain the range limitations discussed by the district court, and that the presence of range limitations was not a proper basis for invalidating those remaining claims. For example, claim 8 of the '141 patent requires, inter alia, a smooth conical tapered tip and "the portion of said tube between said second opening and said conical tapered tip *being larger than* said first lumen in the transverse direction normal to the plane of said septum." Vas–Cath counters that claim 8 of the '141 patent is just as much a "range" claim as claims 1 and 7 of the '329 patent, albeit one having only a lower limit and no upper limit.

Absent any separate discussion of these remaining claims in the district court's opinion, we assume that the court applied to them the same erroneous legal standard. Summary judgment was therefore inappropriate as to the remaining claims. Additionally, the possibility that the '081 drawings may provide an adequate § 112 "written description" of the subject matter of

some of the claims but not others should have been considered. *See, e.g., In re Borkowski*, 422 F.2d 904, 909 n. 4, 164 USPQ 642, 646 n. 4 (CCPA 1970) (on review of § 112 non-enablement rejection: "A disclosure may, of course, be insufficient to support one claim but sufficient to support another.") On remand, the district court should *separately* analyze whether the "written description" requirement has been met as to the subject matter of *each* claim of the '141 and '329 patents.

## CONCLUSION

The district court's grant of summary judgment, holding all claims of the '329 and '141 patents invalid under 35 U.S.C. § 102(b), is hereby reversed as to all claims, and the case remanded for further proceedings consistent herewith.

## COSTS

Each party to bear its own costs.

REVERSED and REMANDED.

## APPENDIX

*Independent Claims of the '329 Patent:*

1. A double lumen catheter having an elongated tube with a proximal first cylindrical portion enclosing first and second lumens separated by an internal divider, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with the respective first and second lumens for the injection and removal of fluid, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said elongated tube, and the second lumen extending from the proximal end of said elongated tube to a second opening at approximately the dis-

---

8. The following colloquy at oral argument before the district court supports our view:

   *Counsel for Mahurkar:* "So the only evidence that we have on this subject from people of ordinary skill in the art is that the drawings do communicate these range limitations, and given the procedural posture of this case, the Court has to accept that evidence...."

   *District Court:* * * * "And if you could have written a large number of things that were different from what was actually filed in 1984, then the diagram isn't enough.

   And that seems to me something that can't be resolved by ogling the Ash declaration. It's really a pure question of law."

tal end of said first cylindrical portion, wherein the improvement comprises:

said elongated tube having at its distal end a smooth conical tapered tip that smoothly merges with a second cylindrical portion of said elongated tube, and said second cylindrical portion enclosing the first lumen from the conical tapered tip to approximately the location of said second opening, wherein said second cylindrical portion has a diameter substantially greater than one-half but substantially less than a full diameter of said first cylindrical portion.

7. A double lumen catheter having an elongated tube with a proximal first cylindrical portion enclosing first and second lumens separated by an internal divider, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with the respective first and second lumens for the injection and removal of fluid, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said elongated tube, and the second lumen extending from the proximal end of said elongated tube to a second opening at approximately the distal end of said first cylindrical portion, wherein the improvement comprises:

said elongated tube having at its distal end a smooth conical tapered tip that smoothly merges with a second cylindrical portion of said elongated tube, and said second cylindrical portion enclosing the first lumen from the conical tapered tip to approximately the location of said second opening, said second cylindrical portion having a diameter substantially greater than one-half but substantially less than a full diameter of said first cylindrical portion, said divider in said first cylindrical portion being planar, the lumens being "D" shaped in cross-section in said first cylindrical portion, the elongated tube being provided with a plurality of holes in the region of the

conical tapered tip, and said first cylindrical portion of the elongated tube smoothly merging with said second cylindrical portion of the elongated tube.

*Independent Claims of the '141 Patent:*

1. A double lumen catheter having an elongated tube with a proximal first cylindrical portion enclosing first and second lumens separated by an internal divider, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with the respective first and second lumens for the injection and removal of fluid, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said elongated tube, and the second lumen extending from the proximal end of said elongated tube to a second opening at approximately the distal end of said first cylindrical portion, wherein the improvement comprises:

said elongated tube having at its distal end a smooth conical tapered tip that smoothly merges with a second cylindrical portion of said elongated tube, and said second cylindrical portion enclosing the first lumen from the conical tapered tip to approximately the location of said second opening, wherein said second sylindrical [sic] portion has a diameter substantially less than a full diameter of said first cylindrical portion but larger than said first lumen in the transverse direction normal to the plane of said flat divider.

7. A double lumen catheter comprising an elongated cylindrical tube enclosing first and second lumens separated by a flat longitudinal internal divider formed as an integral part of said tube, said tube and said divider forming said first and second lumens as semi-cylindrical cavities within said tube, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with the respective first and second lumens for the injection and removal of fluid, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said

elongated tube, said distal end of said tube forming a smooth conical tapered tip and the second lumen extending from the proximal end of said elongated tube to a second opening spaced a substantial distance away from said first opening toward the proximal end of said tube, the distal end of said divider being joined to the outside wall of said tube distal of said second opening, and the outside wall of said tube forming a smooth transition between said conical tapered tip and the outer circumference of the tube proximal of said second opening, said transition being larger than said first lumen in the transverse direction normal to the plane of said flat divider.

8. A double lumen catheter comprising an elongated cylindrical tube having a longitudinal planar septum of one-piece construction with said tube, said septum dividing the interior of said tube into first and second lumens, said lumens being D-shaped in cross-section, the proximal end of said tube connecting to two separate tubes communicating with the respective first and second lumens for the injection and removal of fluids, the lumen extending from the proximal end of said tube to a first lumen extending from the proximal end of said tube to a first opening at the distal end of said tube, and the second lumen extending from the proximal end of said tube to a second opening axially spaced from the distal end of said tube, said tube having at its distal end a smooth conical tapered tip that merges with the cylindrical surface of said tube, said first lumen, including the internal wall thereof formed by said septum extending continuously through said conical tapered tip, and the portion of said tube between said second opening and said conical tapered tip being larger than said first lumen in the transverse direction normal to the plane of said septum.

13. A double lumen catheter comprising an elongated cylindrical tube enclosing first and second lumens separated by a flat longitudinal internal divider formed as an integral part of said tube, said tube and said divider forming said first and second lumens as semi-cylindrical cavities within said tube, the proximal end of said elongated tube connecting to two separate connecting tubes communicating with he [sic] respective first and second lumens for the injection and removal of fluid, the first lumen extending from the proximal end of said elongated tube to a first opening at the distal end of said elongated tube, said distal end of said tube forming a smooth conical tapered tip defining the distal portion of said first lumen and said first opening, said first opening and an adjacent portion of said first lumen having a circular transverse cross-sectional configuration, and the second lumen extending from the proximal end of said elongated tube to a second opening spaced a substantial distance away from said first opening toward the proximal end of said tube, the inside walls of said tube forming a smooth transition between said semicylindrical and circular transverse cross-sectional configurations of said first lumen, the outside dimension of said transition being larger than said first lumen in the transverse direction normal to the plane of said flat divider.